THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:26-cv-00032-MR-WCM

| | |
|---|---|
| Reiter Consulting Services, Inc.<br><br>Plaintiff<br><br>v.<br><br>Sandra Hildenbrand;<br>Potomac Solutions, LLC; and<br>Potomac Solutions, Inc.,<br><br>Defendants | |

**FIRST AMENDED COMPLAINT**

Plaintiff, Reiter Consulting Services, Inc. ("RCS" or "Plaintiff"), by and through its undersigned counsel, complaining of Defendants Sandra Hildenbrand ("Hildenbrand"), Potomac Solutions, LLC ("Potomac Solutions, LLC"), and Potomac Solutions, Inc. ("Potomac Solutions, Inc.") (collectively, "Defendants"), alleges and says as follows:

**PARTIES**

1. Plaintiff, RCS, is a Maryland corporation, owned and operated under the laws of the State of Maryland, and has a principal

place of business at 3208 Chrisland Drive, Annapolis, Maryland 21403. For jurisdictional purposes, RCS is a citizen of Maryland, its state of incorporation and the state in which its principal place of business is located.

2. Upon information and belief, Jack Dallas Hildenbrand deceased (the "Decedent"), although not a party to this action, was an adult resident and domiciliary of McDowell County, North Carolina at the time of his death, including as evidenced by his death certificate. In connection with this case, the Decedent performed work as a subcontractor for RCS primarily at the L'Enfant Plaza United States Postal Inspection Service ("USPIS") location in Washington, D.C. Additionally, during the relevant period, the Decedent regularly conducted business activities related to that work out of a property he and Defendant Hildenbrand owned at 8 Jill Court, Fredericksburg, Virginia 22405 and a property the Decedent owned located at 42 Clay Street, Marion, North Carolina 28752. The Decedent billed RCS under the name "Jack Dallas Hildenbrand d/b/a Potomac Solutions" for the work performed in these locations.

3. Upon information and belief, Defendant Hildenbrand is a

resident and citizen of the Commonwealth of Virginia and domiciled therein, with a last known residential address at 8 Jill Court, Fredericksburg, Virginia 22405, where the Decedent's work was performed on behalf of Potomac Solutions. For jurisdictional purposes, Hildenbrand is a citizen of Virginia, the place of her domicile. Hildenbrand also owns, and has owned, the property located at 42 Clay Street, Marion, North Carolina 28752, where the Decedent's work was performed on behalf of Potomac Solutions, and has continuous and systematic contacts with the State of North Carolina and McDowell County through her property ownership and transactions in the county.

4. Upon information and belief, Defendant Potomac Solutions, LLC is an unincorporated business entity, deemed a partnership under applicable law. Potomac Solutions, LLC owns property in McDowell County, North Carolina and was operated by the Decedent and Hildenbrand, out of their residences at 8 Jill Court, Fredericksburg, Virginia 22405 and 42 Clay Street, Marion, North Carolina 28752. For jurisdictional purposes, Potomac Solutions, LLC is a citizen of Virginia, where Hildenbrand is domiciled, and North Carolina, where the Decedent was domiciled at the time of his death. In connection with this

case, Potomac Solutions, LLC performed work as a subcontractor for RCS at the L'Enfant Plaza United States Postal Inspection Service location in Washington, D.C., as well as at the 8 Jill Court and 42 Clay Street addresses.

5. Upon information and belief, Defendant, Potomac Solutions, Inc., is an unincorporated business entity, deemed a partnership under applicable law. Potomac Solutions, Inc. was operated by the Decedent and Hildenbrand out of their residences at 8 Jill Court, Fredericksburg, Virginia 22405 and 42 Clay Street, Marion, North Carolina 28752. For jurisdictional purposes, Potomac Solutions, Inc. is a citizen of Virginia, where Hildenbrand is domiciled, and North Carolina, where the Decedent was domiciled at the time of his death. In connection with this case, Potomac Solutions, Inc. performed work as a subcontractor for RCS at the L'Enfant Plaza United States Postal Inspection Service location in Washington, D.C., as well as at the 8 Jill Court and 42 Clay Street addresses.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the

amount in controversy exceeds $75,000.00.

7. This Court has personal jurisdiction over Defendants pursuant N.C.G.S. § 1-75.4 and other applicable law, because, at all times relevant hereto, each of Defendants had a local presence or status in North Carolina because they were, are, and continue to be engaged in substantial activity within this State, including owning property. Further, Potomac Solutions, LLC and Potomac Solutions, Inc., and upon information and belief Hildenbrand, engaged in actions causing tortious injury to Plaintiff due to acts conducted within North Carolina, provided services to Plaintiff within North Carolina, and otherwise transacted business in North Carolina, maintained business operations in North Carolina, and performed services in North Carolina giving rise to Plaintiff's claims.

8. Furthermore, this Court has personal jurisdiction over Defendants in this action because Defendants purposefully regularly and routinely transacted business in North Carolina including by working and/or holding a partnership interest in an unincorporated business entity that performed work and conducted business activities in North Carolina.

9. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

10. ECS Federal, Inc. ("ECS Federal") is a federal government contractor which was a prime contractor on a federal government contract with the United States Postal Inspection Service (the "Prime Contract").

11. At all times relevant hereto, RCS was a subcontractor on ECS Federal's Prime Contract.

12. RCS's subcontract with ECS Federal was a time and materials-type subcontract, where the subcontractor is compensated based on an hourly rate for the hours worked as well as the cost of materials supplied.

13. Bruce Reiter ("Reiter"), President of RCS, knew and had a close personal relationship with the Decedent since approximately 1999.

14. In fact, Reiter and the Decedent operated a business together from March 2008 to September 2009, performing web server hosting for the federal government, wherein they developed a close relationship based on trust and respect. Even after they no longer operated the

business, they continued to perform the web server hosting together until 2019 under RCS.

15. Based on their relationship, Reiter believed (albeit incorrectly) the Decedent was a trustworthy and hard-working friend and colleague.

16. Based on that trust, in October 2014, RCS retained the Decedent and a company with which he was affiliated, sometimes referred to as Potomac Solutions, LLC and sometimes referred to as Potomac Solutions, Inc. (collectively, "Potomac Solutions" or the "PS Entities"),[1] to serve as second-tier subcontractors to RCS on ECS Federal's Prime Contract.

17. When RCS retained Decedent and the PS Entities to work on RCS's subcontract, RCS placed a special confidence in Decedent's and the PS Entities' work, statements, representations, and promises. As RCS could not serve as a direct supervisor for Decedent's and PS Entities' work or verify the hours of work the Decedent and the PS Entities performed, RCS had to place the utmost trust in the Decedent's and the

---

[1] Given that Decedent's company operated as both Potomac Solutions, LLC and Potomac Solutions, Inc. interchangeably, hereinafter, the use of "Potomac Solutions" refers to Potomac Solutions, LLC, individually, or Potomac Solutions, Inc., individually, or Potomac Solutions, LLC and Potomac Solutions, Inc., collectively.

PS Entities' representations about what they were doing, how they were doing it, and how many hours they were spending doing that work. In essence, RCS placed its entire professional reputation and corporate livelihood in the hands of a trusted friend, colleague, and former business partner, Decedent, and fully trusted him to make honest, forthright, and fulsome representations about the work performed by Decedent and the PS Entities truthfully and transparently and to act in RCS's best interests at all times related to the work.

18. During the second-tier subcontracting relationship between RCS and the Decedent and the PS Entities, neither Reiter, nor RCS, had knowledge of or access to information about the PS Entities' corporate structure (if any), ownership, internal operations, or allocation of revenues.

19. In their roles as second-tier subcontractors, the Decedent and the PS Entities performed some of the work assigned to RCS on the Prime Contract in exchange for payment. The Decedent and the PS Entities also made representations to ECS Federal on behalf of RCS, through the use of ECS Federal's timekeeping system.

20. Pursuant to the second-tier subcontract arrangement, the

Decedent and the PS Entities agreed to provide certain information technology ("IT") services to RCS. Specifically, they provided senior systems engineer and solution architect services, a certain skill and expertise that RCS did not independently have, in support of ECS Federal's Prime Contract.

21. As RCS did not have this skill and expertise, RCS relied on the Decedent and the PS Entities to act on RCS' behalf when they performed work related to the Prime Contract. The Decedent's and the PS Entities' work was critical to RCS' business reputation with ECS Federal and, ultimately, the Government.

22. RCS placed its utmost trust in the Decedent and the PS Entities, and, in turn, the Decedent and the PS Entities owed RCS duties of care, good faith, candor, trust, and confidence as they carried out their performance related to the Prime Contract.

23. Under RCS' second-tier subcontracting arrangement with the Decedent and the PS Entities, RCS agreed to pay the Decedent and the PS Entities an hourly rate for their work. The Decedent and the PS Entities would only receive payment for the hours they actually worked.

24. The Decedent and the PS Entities submitted their reports of

time worked (e.g., timesheets) directly to ECS Federal. RCS did not have visibility into the specific hours or days they worked or entered into the system.

25. Then, twice per month, RCS would request the total hours the Decedent and the PS Entities worked and provide those to ECS Federal for payment under RCS's name.

26. As RCS came to know at a much later date, Decedent utilized the PS Entities interchangeably, sometimes operating the business as Potomac Solutions, LLC and sometimes as Potomac Solutions, Inc.

27. For instance, Decedent requested that RCS pay for Decedent's work on ECS Federal's Prime Contract to Potomac Solutions, Inc. However, Decedent deposited those payments into a bank account titled in Potomac Solutions, LLC's name and purchased property in North Carolina under Potomac Solutions, LLC's name.

28. Both the Decedent and Hildenbrand had unfettered access to the Potomac Solutions, LLC's bank account at times relevant to these proceedings, including before the Decedent's death (and, with respect to Hildenbrand, after the Decedent's death as well).

29. The Potomac Solutions, LLC account was not a marital

account or a personal account of the Decedent's to which he simply gave Hildenbrand access. Rather, the bank account was an "Initiate Business Checking" account with Wells Fargo, titled in Potomac Solutions, LLC's name only.

30. Wells Fargo advertises the "Initiate Business Checking" account as the "best account for everyday business needs" and that it is "best for business owners building a foundation[,]" offering "support you can count on for a growing business . . . ."

31. Wells Fargo further explains, with regard to its business checking accounts, that when opening such accounts, Wells Fargo is required by law to "verify your business as well as the individuals associated with your business." Thus, the fact that Hildenbrand had uncontrolled access to the Potomac Solutions, LLC bank account evidences her involvement in that business.

32. Hildenbrand was not an employee, of Potomac Solutions, LLC. She did not perform work for Potomac Solutions, LLC. Instead, her involvement in the business was control over and access to all of Potomac Solutions, LLC's assets and the ability to use them for her own personal gain, indicating an ownership interest in Potomac Solutions, LLC.

33. In operating, controlling, and utilizing the benefits of the Potomac Solutions, LLC bank account, the Decedent and Hildenbrand combined their property and effects in common business ventures—the PS Entities—and agreed to share the profits of those business ventures. Decedent and Hildenbrand were agents of one another with respect to the disposition of assets of the PS Entities at all relevant times, and they exercised that agency without the control of the other.

34. During the initial stages of work for the Prime Contract, the Decedent submitted timesheets representing that he worked approximately 12 hours a month on the Prime Contract, which included approximately 3 hours of work on the weekends.

35. In 2016, the amount of work required under the Prime Contract (and, in turn, RCS' subcontract) increased significantly due to government need.

36. Accordingly, in 2016, the Decedent and the PS Entities began reporting to RCS that they were working 40 hours per week under the Prime Contract.

37. At various times, Decedent admitted to Reiter that Hildenbrand had spending (e.g., shopping) issues, and he needed to work

that much in order to pay for Hildenbrand's spending habits.

38. At this time, neither Reiter, nor RCS, had knowledge or notice that Hildenbrand had unfettered access to the Potomac Solutions, LLC bank account in which RCS' payments to the Decedent were automatically deposited.

39. When the Decedent and the PS Entities provided their bi-monthly invoices to RCS, RCS reviewed them and paid them, receiving reimbursement from ECS Federal for that work.

40. During calendar year 2020, the Decedent and the PS Entities submitted timesheets to ECS Federal and invoices to RCS representing that they were working full time, *i.e.*, 40 hours per week, on the Prime Contract.

41. Meanwhile, the Decedent and the PS Entities were also working simultaneously for a second federal contractor, Perspecta Enterprise Solutions LLC ("Perspecta"), on its prime contract with the USPS. RCS later learned that Decedent and the PS Entities claimed to work approximately 37.5 hours per week for Perspecta.

42. RCS understood that the Decedent and the PS Entities were working for RCS mostly in the evenings, at night, and on weekends.

Indeed, the Decedent and the PS Entities were "on call" for USPS needs, and they could be called on to work on the Prime Contract at any time of day as a result.

43. Because the work often took place in the evenings, at night, and on weekends, the work often was performed away from the USPS facilities, including at the property at 8 Jill Court in Alexandria, Virginia, owned by both the December and Hildenbrand, and at 42 Clay Street in Marion, North Carolina. And because the work was performed remotely, RCS was not on site and could not supervise the work to ensure all hours were properly billed.

44. Rather, RCS placed its trust in the Decedent to accurately and appropriately record the hours worked, and RCS placed that trust in the Decedent based on their close personal relationship.

45. In December 2020, RCS was informed that the Decedent and the PS Entities could no longer work on two contracts at once. This is not uncommon in the government contracting industry and is not, standing alone, an indication of fraud or misbilling. Accordingly, RCS removed the Decedent and the PS Entities from working on the ECS Federal Prime Contract.

46. Upon information and belief, sometime after December 2020, unbeknownst to RCS, the United States Government began investigating the Decedent and the PS Entities' reported work on the Prime Contract and Perspecta's contract.

47. Prior to the conclusion of the investigation, the Decedent died on October 4, 2021.

48. RCS later came to learn that the Decedent, through the PS Entities, regularly overstated the hours worked to RCS, to ECS Federal, and to the federal government.

49. RCS also later came to learn that the Decedent and the PS Entities billed USPS for an average of approximately 16 hours of work per day from June 2016 through December 2020, thereby representing that they worked full time simultaneously on both the Perspecta Contract and the ECS Federal Prime Contract.

50. RCS also later came to learn that the Decedent and the PS Entities also represented that they were working weekdays for RCS, not nights and weekends, as they had represented to RCS previously.

51. The Decedent's and the PS Entities' representations about hours worked were false, and they knew them to be false when they were

made.

52. In addition, the Decedent intentionally concealed his and the PS Entities' true activities from RCS and Reiter in order to continue to perpetuate their fraud. They knew that, if RCS learned that the Decedent and the PS Entities were charging RCS for work not performed, RCS would terminate the relationship immediately, and the Decedent needed the income received from RCS to fund the Potomac Solutions, LLC bank account to satisfy Hildenbrand's spending habits and in furtherance of the Decedent's and Hildenbrand's agreement to share all profits of the Potomac Solutions, LLC business bank account.

53. RCS also later came to learn that in May and June 2016, the Decedent and the PS Entities also falsely billed the United States Department of State through a third IT contract ("State Department Contract"), which overlapped in time with the ECS Federal and Perspecta contracts. The Decedent and the PS Entities charged the federal government for an average of approximately 19 hours of work per day over this period.

54. The Decedent and the PS Entities concealed their work for the third contractor from RCS. RCS would not have continued to subcontract

to the Decedent and the PS Entities if RCS knew that the Decedent and the PS Entities were working on three contracts at the same time.

55. The Decedent and the PS Entities also falsely billed USPS during fiscal year 2018. Upon information and belief, the Decedent and the PS Entities charged approximately 17 hours of work per day when they were not actually working those hours.

56. RCS eventually learned that, in or around July 2019, during a specific five-day period, the Decedent and the PS Entities falsely billed a combined 16 hours of work per day to the ECS Federal and Perspecta contracts. Over these five days, the Decedent and the PS Entities had no VPN or network login activity on the USPS systems, meaning no work could have been done on those days.

57. RCS also eventually learned that the Decedent's USPS badge swipe records and E-ZPass records confirmed he routinely left L'Enfant Plaza before regular work hours were complete during the period he represented working as a subcontractor of RCS. On more than one occasion, the Decedent left L'Enfant Plaza and traveled to his residence in Marion, North Carolina (at a property owned by the Decedent and Hildenbrand) during the workday. The Decedent also claimed he had

duties requiring him to travel to the National Law Enforcement Communications Center ("NLECC") in Dulles, Virginia, but his USPS badge swipe records showed no entries at that location.

58. Upon information and belief, the payments made by RCS, Perspecta, and the third contractor to the Decedent and the PS Entities for their "work" on the three contracts all were deposited into the same Potomac Solutions LLC business bank account over which both the Decedent and Hildenbrand had control.

59. RCS could not have discovered the Decedent's and PS Entities' fraud through the exercise of due diligence because it had no access to Perspecta's or the third contractor's records, the Government's investigatory file, or the Potomac Solutions, LLC bank account records, all of which are confidential business records to which RCS had no right or authority to access. Nor could RCS interview or investigate the matter itself, because the Decedent had died on October 4, 2021 and was unavailable for interview or investigation by RCS.

60. In December 2022, RCS was informed by ECS Federal for the first time that the Government concluded its investigation of the Decedent and the PS Entities and determined that their

misrepresentations about hours worked resulted in (a) the Decedent and the PS Entities overbilling RCS; (b) RCS in turn overbilling ECS Federal; and (c) ECS Federal in turn overbilling the government, in the amount of $913,145.00.

61. USPS made a demand of ECS Federal to reimburse the government all $913,145.00, which, on information and belief, ECS Federal did.

62. The demand from ECS Federal indicated that "the USPS concluded that RCS improperly billed for [the Decedent's] services and has issued a demand to ECS for a refund in the amount of $913,145.00 . . . ."

63. While the ECS Federal demand letter indicated the Government had determined RCS improperly billed for the Decedent's services, it did not indicate that the Decedent had engaged in fraud or had billed for hours not worked (as opposed to any other innocent reason for improper billing). For instance, the Government also can seek reimbursement from contractors for work not performed up to the standard required by the contract.

64. The Government did not communicate its specific findings

directly or indirectly to RCS.

65. Pursuant to ECS Federal's subcontract with RCS, ECS Federal demanded that RCS make full payment of $913,145.00 to ECS Federal.

66. In response to the ECS Federal demand letter, RCS informed ECS Federal that "RCS had absolutely no knowledge of any alleged improper billing by [the Decedent] at the time of the billing and has no evidence of improper billing at this time" (i.e., as of December 2022). RCS made a request for an itemization of the charges involved and any documents supporting the claims.

67. On January 11, 2023, RCS came to learn for the first time sufficient information to indicate that the Decedent had engaged in fraud that the Decedent had affirmatively concealed from RCS previously.

68. RCS ultimately reimbursed ECS Federal through three credits against invoices RCS would have submitted to ECS Federal for work actually performed by RCS.

69. The first credit for $420,427.89 was agreed to on December 29, 2022 and, on information and belief, applied no earlier than January 2, 2023. The remaining credits, totaling $492,717.11 were applied in

early March and early April 2023, respectively.

70. As the Decedent and the PS Entities were the sole and exclusive cause of RCS' losses associated with the repayment to the government of the Decedent and the PS Entities' fraudulent billings, the Decedent and the PS Entities owed RCS reimbursement for all amounts RCS paid to ECS Federal.

71. Therefore, on January 31, 2023, RCS made a formal written demand for reimbursement to Hildenbrand, who Plaintiff understood to be the Personal Representative of the Estate of Jack Dallas Hildenbrand.

72. The formal written demand laid out the background of the claim, the specific allegations against the Decedent and the PS Entities and basis for the claim for repayment, the total amount of payment due, and the contact information for the claimant (i.e., RCS).

73. Despite control over the Potomac Solutions LLC business bank account in which funds owed to RCS were deposited, Hildenbrand declined to reimburse RCS via letter dated February 14, 2023 and continuously thereafter, thereby confirming her ability to control, and her actual control over, Potomac Solutions LLC's assets and business decisions.

74. To date, the Decedent, Hildenbrand, and the PS Entities have refused to repay the amounts obtained from RCS through their fraud.

75. At all times since January 31, 2023, Hildenbrand has continued to exercise control over the Potomac Solutions, LLC business bank account and Potomac Solutions, LLC's assets, including real property in North Carolina; has made operational and strategic decisions on behalf of Potomac Solutions, LLC; has paid property taxes on Potomac Solutions, LLC's property in North Carolina; and, yet, has failed to pay out funds to RCS despite a valid demand for same. Meanwhile, Hildenbrand has not sought appointment of a receiver or other third-party to liquidate Potomac Solutions, LLC's assets for the payment of creditors. To this day, Hildenbrand continues to exercise sole and exclusive dominion and control over Potomac Solutions, LLC's assets and bank accounts.

76. Hildenbrand has never claimed that the Decedent or the PS Entities did not engage in fraud. Nor has Hildenbrand denied that RCS has a legitimate, valid, and payable claim against the Decedent or the PS Entities. Yet, despite her unfettered control over Potomac Solutions, LLC's assets, she continues to refuse to pay that claim from Potomac

Solutions, LLC's remaining assets.

77. Further, when Hildenbrand received the demand from RCS, she did not open an estate for the Decedent despite notice that creditors existed with valid claims.

78. Rather, on February 14, 2023, through her then-counsel, Hildenbrand made a number of representations about the existence of the Decedent's estate. Notably, Hildenbrand never represented that the Decedent's estate did not exist.

79. Hildenbrand knew, at the time the letter was sent, that no estate had been opened and that she had no intention of opening an estate. Yet, her agent and attorney made a number of representations about an estate anyway and concealed the fact that an estate did not exist.

80. If Hildenbrand believed that Potomac Solutions, LLC was solely owned by the Decedent, it was her obligation to open, and she would have opened, an estate to dispose of the Decedent's ownership interests in Potomac Solutions, LLC and distribute its assets to creditors and/or the estate, as appropriate. Hildenbrand was aware of existing claims of creditors, including specifically RCS, no later than February 14,

2023, during a time she could have opened an estate for the Decedent, but she chose not to do so and, instead, took actions to preserve her control over Potomac Solutions, LLC's assets, contrary to the interests of its creditors.

81. Indeed, Hildenbrand did not open the estate or dispose of Potomac Solutions, LLC's assets for distribution to creditors, and instead utilized those assets for her own personal use and benefit, indicating she understood she had an ownership interest in those assets as a partner in Potomac Solutions LLC.

82. On September 25, 2023, based on the representations of Hildenbrand's counsel and other data, Plaintiff filed suit against Hildenbrand, in her purported capacity as the Personal Representative of the Estate of Jack Dallas Hildenbrand, and Potomac Solutions, LLC in the United States District Court for the District of Columbia, Case No. 1:23-cv-02805-RCL (the "Prior Litigation"). That matter has since been dismissed with prejudice as to Hildenbrand (in her capacity as Personal Representative of the Estate of Jack Dallas Hildenbrand) and without prejudice as to Potomac Solutions LLC. Hildenbrand, in her individual capacity, was not a party to the Prior Litigation.

83. During motions practice and discovery in the Prior Litigation, in or after February 2024, Plaintiff learned for the first time that it was possible neither of the PS Entities was registered to do business in any state. Despite bearing the monikers "LLC" and "Inc." the PS Entities were not, in fact, limited liability companies or corporations. They were, instead, simply unincorporated associations through which the Decedent and Hildenbrand conducted business for profit and utilized those profits for personal gain.

84. At all times relevant to the facts underlying this case, the PS Entities were operated as partnerships, with the Decedent and Hildenbrand having total access to, control over, and unbridled use of the PS Entities' assets and profits.

85. Payments for the Decedent's and the PS Entities' work on the ECS Federal Prime Contract were deposited directly into a business checking account in the name of Potomac Solutions LLC, which listed a business address of 42 Clay Street, Marion, North Carolina, where monthly account statements were mailed.

86. Payments for the Decedent's and the PS Entities' work on the Perspecta Contract were also deposited into the same Potomac Solutions

LLC business checking bank account.

87. In addition, the payments received for the Decedent's and the PS Entities' work on the State Department Contract also appear to have been deposited into the same Potomac Solutions LLC business checking bank account.

88. Both the Decedent and Hildenbrand had the authority to and actually did utilize the Potomac Solutions LLC bank account at all relevant times. Indeed, Hildenbrand paid personal expenses and transferred funds from the Potomac Solutions LLC business checking bank account to her personal bank accounts.

89. Hildenbrand had authority to utilize the Potomac Solutions LLC bank account and to use, retain, and/or dispose of the assets in the Potomac Solutions LLC bank account in her discretion.

90. Indeed, according to spending entries in the Potomac Solutions LLC bank account statements, Hildenbrand had full access to the Potomac Solutions LLC bank account into which RCS payments were deposited at least as early as 2017. Bank statement records between 2017 and 2021 show expenditures entirely consistent with the Decedent's reports to Reiter of Hildenbrand's spending habits, including repeated

charges at nail salons; many charges at shopping malls all made in the same day at stores indicating Hildenbrand was the person utilizing the account; payments of Hildenbrand's credit cards; payments of Hildenbrand's cellular telephone bills; payments for utility bills in Hildenbrand's name; payments for car financing for Hildenbrand's vehicles; and charges at stores in Virginia (where Hildenbrand's primary residence is located) at times when the Decedent was known to be or represented himself as being in North Carolina. In addition, there are bank record entries that evidence direct transfers from the Potomac Solutions LLC bank account to bank accounts held in Hildenbrand's name.

91. Hildenbrand's control over and access to the Potomac Solutions LLC business checking bank account continued even after the Decedent's death. Whereas the Decedent died on October 4, 2021, there were charges authorized at T.J. Maxx, Wal-Mart, and Belk on October 5, 2021, and repeated charges for food, apparel, and other shopping authorized over the next several weeks. These types of charges are not auto-debit or recurring charges, but independent in-store or online charges made by a person with access to a debit card: Hildenbrand. The

charges made after the Decedent's death are consistent with the charges made before Decedent's death, including charges at the same stores and in similar amounts, confirming Hildenbrand had control over and access to the Potomac Solutions LLC bank account at all relevant times.

92. On information and belief, the debit card for the Potomac Solutions, LLC business checking account that Hildenbrand had in her possession would have had "Business Debit" emblazoned on it, consistent with Wells Fargo's current branding for "Initiate Business Checking" accounts.

93. The Decedent's and Hildenbrand's intent to form a partnership, in the form of the PS Entities, is evident from the conduct of the parties, e.g., their joint use of, control over, and access to the Potomac Solutions, LLC business checking bank account, their independent access to and use of debit cards for the Potomac Solutions, LLC business checking bank account, and their unilateral ability to transfer funds from the Potomac Solutions, LLC business checking bank account to other personal bank accounts of their own, among many other factors showing their intent to form a partnership.

94. Bank records also indicate that Hildenbrand made transfers

from a checking account in the name of the Decedent into the Potomac Solutions LLC bank account for several months after the Decedent's death. Hildenbrand also continued to pay her credit card, telephone, and car payments out of that account, depleting the Decedent's and Potomac Solutions, LLC's assets without opening an estate in the Decedent's name, and without any investigation or inquiry as to whether Potomac Solutions or the Decedent had creditors who had claims to Potomac Solutions LLC's assets. Hildenbrand's conduct in making affirmative decisions about how to dispose of Potomac Solutions, LLC's assets, without regard to the rights of creditors indicated that she understood herself to have absolute control over Potomac Solutions, LLC's operations and assets.

95. Additionally, in 2023, Plaintiff learned that Potomac Solutions LLC owned a parcel of real property in Marion, North Carolina titled in Potomac Solutions LLC's name.

96. Plaintiff also obtained records showing that, after Mr. Hildenbrand's death, Hildenbrand continued to pay the real estate taxes for the North Carolina property in Potomac Solutions LLC's name exercising control over tasks solely and exclusively the responsibility of

Potomac Solutions, LLC (and not the Decedent, individually) to perform.

97. Indeed, Hildenbrand benefitted greatly from the purchase of assets with funds received as a result of the Decedent's and the PS Entities' overbillings, including the parcel of real property in Marion, North Carolina, which is, upon information and belief, under Hildenbrand's exclusive possession and control still to this day.

98. Based on their conduct, the Decedent and Hildenbrand formed partnerships, in the form of the PS Entities, where they pursued a common goal (i.e., obtain funds for the Decedent's work for RCS on the ECS Federal Prime Contract and other contracts) and both had control over and access to all assets, utilizing those funds overwhelmingly to benefit Hildenbrand's high-spending lifestyle.

99. Upon information and belief, and as indicated by the purchases on the Potomac Solutions, LLC business checking bank account statements, Hildenbrand had unfettered authority and unrestricted access to spend and/or dispose of Potomac Solutions, LLC's assets in her discretion, not subject to the Decedent's or any other person's authority, indicating she was an unrestricted co-owner of the partnership.

100. As general partners together in the PS Entities, the Decedent and Hildenbrand are jointly and severally liable for any and all debts in the name of the PS Entities.

101. Furthermore, the PS Entities never observed any corporate formalities. They did not conduct meetings, create meeting minutes, pass resolutions, or register as businesses with the state (and, upon information and belief, any state). Despite RCS requesting such documentation in discovery in the Prior Litigation, no documents evidencing corporate formalities were ever produced, and Hildenbrand did not appear to believe any such documents existed.

102. Further, both the Decedent and Hildenbrand had control over and access to the Potomac Solutions, LLC business checking bank account, with the authority, ability, and discretion to make personal charges to that account, without observing the corporate formality of making distributions to partners or receiving approval from other partners. Rather, they used the limited liability company bank account as if it was a personal slush fund to suit their own personal aims.

103. The PS Entities and the Potomac Solutions, LLC bank account over which Hildenbrand had control were used as a vehicle to

defraud RCS and the government. Specifically, the Decedent performed work for RCS, but he masked his work as being performed by Potomac Solutions, Inc., giving RCS the appearance of corporate viability and formality. Despite utilizing a Potomac Solutions, LLC business checking bank account, neither the Decedent nor Hildenbrand ever registered Potomac Solutions, Inc. or Potomac Solutions, LLC as a formal corporate entity or limited liability company. The Decedent further defrauded RCS by depositing payments received into a bank account for Potomac Solutions, LLC, creating a web of deceit that concealed the fraudulent nature of the Decedent's actions, conducted for his and Hildenbrand's benefit.

104. Both the Decedent and Hildenbrand benefitted greatly from the use of the fraudulent PS Entities and endeavored to shield those benefits, including several parcels of real property, by titling them in their personal names or in the names of the fictitious corporate entities. The funds used to obtain those benefits (including the parcels of real property) were derived entirely from the Decedent's and the PS Entities' fraudulent schemes and overbillings, including funds originally deposited into the Potomac Solutions, LLC bank account over which the

Decedent and Hildenbrand had equal access and control.

105. In sum, the Decedent and Hildenbrand utilized the PS Entities to perpetuate and benefit personally from a long-term fraudulent scheme, justifying holding them liable in their individual capacities.

**COUNT I**
**Fraud**
**(All Defendants)**

106. Plaintiff incorporates by reference the previous paragraphs of the Complaint as if fully set forth and restated herein.

107. Over the course of the Decedent's and the PS Entities' subcontracting arrangement with RCS, and specifically from 2016 through 2020, the Decedent and the PS Entities made false representations of material fact to RCS when they submitted timesheets and invoices and reported hours worked to RCS that the Decedent and the PS Entities did not actually work.

108. These false statements were made by the Decedent on behalf of himself and the PS Entities on or about the 15th day of each month and the last day of each month, from January 1, 2016 through December 31, 2020.

109. The false statements included that the Decedent and the PS Entities had worked 40 hours per week on the ECS Federal Prime Contract when they did not work those hours, or anything close to them.

110. These false statements were made by the Decedent to ECS Federal (the timesheets) and by the Decedent to Reiter and RCS (the invoices) each time.

111. The false statements related to a material fact because ECS Federal's Prime Contract, RCS' subcontract, and the Decedent's and the PS Entities' second-tier subcontracting arrangement were all time and materials-type contracts, meaning that the parties were only paid for the hours worked and materials provided.

112. The amount of time actually worked was material because it formed the basis for all payments to the Decedent and the PS Entities and any misrepresentation of those hours worked would result in a fraud against the government.

113. The Decedent knew, and by virtue of the Decedent's knowledge, the PS Entities knew, at the time they reported their hours to RCS, that the reports were false. The Decedent himself was performing the work, thus he was the person in the best position to know the accurate

number of hours he actually worked. But the Decedent was working far less than the 40 hours per week on the ECS Prime Contract that he reported.

114. Furthermore, Hildenbrand knew that the Decedent was not working an average of 17 hours per day, every day, or near the number of hours he billed. Hildenbrand also knew that the Decedent was not working sufficient hours to generate the kind of income he was generating, including receiving funds that allowed the Decedent and Hildenbrand to purchase multiple properties and pay for Hildenbrand's lavish high-spending lifestyle.

115. The Decedent, on behalf of himself and the PS Entities, intended to deceive RCS by misrepresenting the hours actually worked in order to obtain additional money to which they were not entitled.

116. RCS acted in reliance on the Decedent's misrepresentations, made on behalf of the Decedent himself and the PS Entities, by actually paying the Decedent and the PS Entities for the misrepresented hours.

117. Prior to January 11, 2023, RCS could not have discovered the Decedent's and PS Entities' fraud through the exercise of due diligence because it had no access to Perspecta's or the third contractor's records,

the Government's investigatory file, or the Potomac Solutions, LLC bank account records, all of which are confidential business records to which RCS had no right or authority to access. Nor could RCS interview or investigate the matter itself, because the Decedent had died on October 4, 2021 and was unavailable for interview or investigation by RCS.

118. Further, RCS did not have knowledge of the fraudulent use of unregistered limited liability companies or corporations or Hildenbrand's unfettered access to the corporate bank accounts.

119. As a direct and proximate result of the Decedent's and the PS Entities' fraud, RCS suffered damages in the amount of at least $913,145.00, plus attorneys' fees and costs associated with remedying the fraud.

120. The Decedent's and the PS Entities' fraud was committed with actual malice and intent to harm and was based on an intentional misrepresentation, justifying an award of exemplary and/or punitive damages. Specifically, the Decedent, on behalf of himself, Hildenbrand, and the PS Entities, engaged in the scheme with the specific purpose of benefiting both him and Hildenbrand and with intentional disregard for RCS' rights.

121. RCS did not suffer damages as a result of the Decedent's and PS Entities' fraud until at least January 2, 2023, when it gave ECS Federal a credit against its unpaid invoices.

122. At all times relevant hereto, the Decedent and Hildenbrand voluntarily associated to carry on the business known as Potomac Solutions as co-owners for profit, thereby forming a general partnership under N.C.G.S. § 59-36(a). As noted above, both the Decedent and Hildenbrand exercised absolute joint dominion and control over Potomac Solutions, LLC's assets, including all funds obtained as a result of the fraudulent scheme. They had authority to use Potomac Solutions, LLC's assets without seeking approval from each other or other partners and without exercising any corporate formalities whatsoever. And they exercised this unilateral dominion, control, and authority throughout the timeframe of the fraudulent scheme, including before the Decedent's death.

123. The Decedent and Hildenbrand combined their labor, efforts, property, and financial resources in furtherance of Potomac Solutions' business activities. The Decedent provided technical services and generated revenue through federal subcontracting work, while

Hildenbrand exercised control over partnership funds, received and spent partnership income, and utilized the partnership's profits for her own and the partnership's benefit.

124. Hildenbrand's independent control over and interest in the PS Entities is demonstrated in a number of ways, including, but not limited to, that, despite control over the Potomac Solutions LLC bank account in which funds owed to RCS were deposited, Hildenbrand refused to reimburse RCS upon demand, thereby confirming her ability to control, and actual control over, Potomac Solutions LLC's assets and business decisions.

125. In an effort to further conceal the true nature of the business, Hildenbrand, through counsel on February 14, 2023, made statements representing the existence of the Decedent's estate when no such estate existed, and she failed to open an estate when she became aware of a creditor's claims.

126. At all times since January 31, 2023, Hildenbrand has continued to exercise control over the Potomac Solutions, LLC bank account and Potomac Solutions, LLC's assets, including real property in North Carolina; has made operational and strategic decisions on behalf

of Potomac Solutions, LLC; has paid property taxes on Potomac Solutions, LLC's property in North Carolina; and, yet, has failed to pay out funds to RCS despite a valid demand for same. Meanwhile, Hildenbrand has not sought appointment of a receiver or other third-party to liquidate Potomac Solutions, LLC's assets for the payment of creditors. To this day, Hildenbrand continues to control Potomac Solutions, LLC's assets and bank accounts.

127. Both the Decedent and Hildenbrand further contributed to the fraud scheme. Despite utilizing a bank account in the name of Potomac Solutions, LLC and maintaining unfettered control over Potomac Solutions, LLC's assets, neither Decedent, nor Hildenbrand, registered Potomac Solutions, LLC as a formal entity, contributing to the concealment of the true nature of the Decedent's and the PS Entities' fraud.

128. As partners in a partnership performing on federal government contracts, both the Decedent and Hildenbrand had an affirmative and mandatory duty to make a report to the Government if they came across credible evidence of a violation of the federal False Claims Act or other procurement violation. Both the Decedent and

Hildenbrand had credible evidence of a violation of the federal False Claims Act and other procurement violations given their access to funds derived from the fraudulent scheme that were substantially disproportionate to the amount of time the Decedent was working, yet neither the Decedent nor Hildenbrand made the mandatory report.

129. At all times relevant hereto, Hildenbrand was a general partner in the unincorporated PS Entities. She had unilateral control over and unrestricted access to the PS Entities' assets, including each and every payment made by RCS to the Decedent and the PS Entities by virtue of her access to and control over the Potomac Solutions LLC bank account, where the payments were deposited. She had no obligation to seek the Decedent's consent or to otherwise observe corporate formalities to access those funds or to spend them in her absolute discretion. She also exercised control over Potomac Solutions, LLC's business operations after the Decedent's death, making strategic and operational decisions, including not to pay Potomac Solutions, LLC's creditors.

130. Hildenbrand also benefitted greatly from the receipt of the fraudulently-obtained funds by spending those funds for personal items and to transfer cash to her personal bank accounts and pay her bills both

before and after the Decedent's death without the need to obtain the Decedent's consent or observe corporate formalities.

131. By virtue of her partnership in the PS Entities, Hildenbrand is liable, personally and individually, to the same extent the PS Entities are liable for the fraud committed against RCS.

132. In addition, Hildenbrand is personally liable for the fraud committed against RCS by the PS Entities through veil piercing, because the PS Entities did not observe any corporate formalities and the PS Entities were used to perpetuate a fraud and to avoid the Decedent and Hildenbrand incurring personal liability for the Decedent's and the PS Entities' fraud and other wrongdoing.

**COUNT II**
**Common Law Contribution**
**(All Defendants)**

133. Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth and restated herein.

134. By virtue of the close personal relationship between the Decedent and the PS Entities (on one hand) and RCS (on the other hand) and the trust RCS placed in the Decedent and the PS Entities, the

Decedent and the PS Entities owe RCS a common law duty of contribution for losses and damages suffered by RCS as a result of the Decedent's and the PS Entities' wrongdoing and misconduct.

135. The Decedent and the PS Entities breached a duty of candor and good faith to RCS when they misrepresented and over-reported the hours they worked on the ECS Prime Contract.

136. RCS suffered a loss in an amount in excess of $913,145.00, solely and exclusively as a result of the Decedent's and the PS Entities' false representations of the hours they claim to have worked on the ECS Prime Contract and the Decedent's, the PS Entities', and Hildenbrand's active concealment of the fraud by failing to register Potomac Solutions, LLC as a valid business, failing to report fraudulent conduct, despite a mandatory duty to do so, and utilizing Potomac Solutions, LLC's assets for personal use without observing corporate formalities.

137. RCS has actually paid ECS $913,145.00, with the first portion of the payment credited in early January 2023 and the remainder credited in March and April 2023.

138. The Decedent, Hildenbrand, and the PS Entities have refused to reimburse RCS for those losses, including out of the Potomac Solutions,

LLC bank account. Indeed, after the Decedent's death, Hildenbrand assumed total control over Potomac Solutions, LLC, including making operational and strategic decisions on its behalf, including refusing to pay legitimate claims from Potomac Solutions, LLC's creditors, continuing to use Potomac Solutions, LLC's bank accounts for personal benefit, and determining not to seek the appointment of a receiver for Potomac Solutions, LLC's assets, all for her own benefit.

139. It would be unjust and unsatisfactory as a matter of law and policy for RCS to suffer losses caused solely and exclusively by the Decedent, Hildenbrand, and the PS Entities without receiving fair contribution from the Decedent, Hildenbrand, and the PS Entities.

140. The Decedent and the PS Entities are required to contribute to RCS for all fair losses incurred as a result of their misconduct, including the $913,145.00 RCS paid to ECS as a result of the Decedent's and the PS Entities' overbilling on the ECS Prime Contract.

141. At all times relevant hereto, the Decedent and Hildenbrand voluntarily associated to carry on the business known as Potomac Solutions as co-owners for profit, thereby forming a general partnership under N.C.G.S. § 59-36(a). As noted above, both the Decedent and

Hildenbrand exercised absolute joint dominion and control over Potomac Solutions, LLC's assets, including all funds obtained as a result of the fraudulent scheme. They had authority to use Potomac Solutions, LLC's assets without seeking approval from each other or other partners and without exercising any corporate formalities whatsoever. And they exercised this unilateral dominion, control, and authority throughout the timeframe of the fraudulent scheme, including before the Decedent's death.

142. The Decedent and Hildenbrand combined their labor, efforts, property, and financial resources in furtherance of Potomac Solutions' business activities. The Decedent provided technical services and generated revenue through federal subcontracting work, while Hildenbrand exercised control over partnership funds, received and spent partnership income, and utilized the partnership's profits for her own and the partnership's benefit.

143. Hildenbrand's independent control over and interest in the PS Entities is demonstrated in a number of ways, including, but not limited to, that, despite control over the Potomac Solutions LLC bank account in which funds owed to RCS were deposited, Hildenbrand refused to

reimburse RCS upon demand, thereby confirming her ability to control, and actual control over, Potomac Solutions LLC's assets and business decisions.

144. At all times since January 31, 2023, Hildenbrand has continued to exercise control over the Potomac Solutions, LLC bank account and Potomac Solutions, LLC's assets, including real property in North Carolina; has made operational and strategic decisions on behalf of Potomac Solutions, LLC; has paid property taxes on Potomac Solutions, LLC's property in North Carolina; and, yet, has failed to pay out funds to RCS despite a valid demand for same. Meanwhile, Hildenbrand has not sought appointment of a receiver or other third-party to liquidate Potomac Solutions, LLC's assets for the payment of creditors. To this day, Hildenbrand continues to control Potomac Solutions, LLC's assets and bank accounts.

145. Both the Decedent and Hildenbrand further contributed to the fraud scheme. Despite utilizing a bank account in the name of Potomac Solutions, LLC and maintaining unfettered control over Potomac Solutions, LLC's assets, neither Decedent, nor Hildenbrand, registered Potomac Solutions, LLC as a formal entity, contributing to the

concealment of the true nature of the Decedent's and the PS Entities' fraud.

146. As partners in a partnership performing on federal government contracts, both the Decedent and Hildenbrand had an affirmative and mandatory duty to make a report to the Government if they came across credible evidence of a violation of the federal False Claims Act or other procurement violation. Both the Decedent and Hildenbrand had credible evidence of a violation of the federal False Claims Act and other procurement violations given their access to funds derived from the fraudulent scheme that were substantially disproportionate to the amount of time the Decedent was working, yet neither the Decedent nor Hildenbrand made the mandatory report.

147. At all times relevant hereto, Hildenbrand was a general partner in the unincorporated PS Entities. She had unilateral control over and unrestricted access to the PS Entities' assets, including each and every payment made by RCS to the Decedent and the PS Entities between 2017 and the present by virtue of her access to and unfettered control over the Potomac Solutions LLC bank account, where the payments were deposited. She had no obligation to seek the Decedent's

consent or to otherwise observe corporate formalities to access those funds or to spend them in her absolute discretion. She also exercised control over Potomac Solutions, LLC's business operations after the Decedent's death, making strategic and operational decisions, including not to pay Potomac Solutions, LLC's creditors.

148. Hildenbrand also benefitted greatly from the receipt of the fraudulently obtained funds by spending those funds for personal items and to transfer cash to her personal bank accounts, all funding her significant personal spending without the need to obtain the Decedent's consent or observe corporate formalities.

149. By virtue of her partnership in the PS Entities, Hildenbrand is liable, personally and individually, to the same extent the PS Entities are liable for the amount of contribution owed to RCS.

150. In addition, Hildenbrand is personally liable for the fraud committed against RCS by the PS Entities, and the associated contribution obligations arising therefrom, through veil piercing, because the PS Entities did not observe any corporate formalities and the PS Entities were used to perpetuate a fraud and to avoid the Decedent and Hildenbrand incurring personal liability for the Decedent's and the PS

Entities' fraud and other wrongdoing.

**COUNT III**
**Common Law Indemnification**
**(All Defendants)**

151. Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth and restated herein.

152. By virtue of the close personal relationship between the Decedent and PS Entities (on one hand) and RCS (on the other hand) and the trust RCS placed in the Decedent and the PS Entities, the Decedent and the PS Entities owe RCS a common law duty of indemnification for losses and damages suffered by RCS as a result of the Decedent's and the PS Entities' wrongdoing and misconduct.

153. The Decedent and the PS Entities breached a duty of candor and good faith to RCS when they misrepresented and over-reported the hours they worked on the ECS Prime Contract.

154. RCS suffered a loss in an amount in excess of $913,145.00, solely and exclusively as a result of the Decedent's and the PS Entities' false representations of the hours they claim to have worked on the ECS Prime Contract and the Decedent's, the PS Entities', and Hildenbrand's

active concealment of the fraud by failing to register Potomac Solutions, LLC as a valid business, failing to report fraudulent conduct, despite a mandatory duty to do so, and utilizing Potomac Solutions, LLC's assets for personal use without observing corporate formalities.

155. RCS has actually paid ECS $913,145.00, with the first portion of the payment credited in January 2023 and the remainder credited in March and April 2023.

156. The Decedent, Hildenbrand, and the PS Entities have refused to reimburse RCS for those losses, including out of the Potomac Solutions, LLC bank account. Indeed, after the Decedent's death, Hildenbrand assumed total control over Potomac Solutions, LLC, including making operational and strategic decisions on its behalf, including refusing to pay legitimate claims from Potomac Solutions, LLC's creditors, continuing to use Potomac Solutions, LLC's bank accounts for personal benefit, and determining not to seek the appointment of a receiver for Potomac Solutions, LLC's assets, all for her own benefit.

157. It would be unjust and unsatisfactory as a matter of law and policy for RCS to suffer losses caused solely and exclusively by the Decedent, Hildenbrand, and the PS Entities.

158. The Decedent, Hildenbrand, and the PS Entities are required to indemnify RCS for all losses incurred as a result of the Decedent's, Hildenbrand's, and the PS Entities' misconduct, including the $913,145.00 RCS paid to ECS as a result of the Decedent's and the PS Entities' overbilling on the ECS Prime Contract.

159. At all times relevant hereto, the Decedent and Hildenbrand voluntarily associated to carry on the business known as Potomac Solutions as co-owners for profit, thereby forming a general partnership under N.C.G.S. § 59-36(a). As noted above, both the Decedent and Hildenbrand exercised absolute joint dominion and control over Potomac Solutions, LLC's assets, including all funds obtained as a result of the fraudulent scheme. They had authority to use Potomac Solutions, LLC's assets without seeking approval from each other or other partners and without exercising any corporate formalities whatsoever. And they exercised this unilateral dominion, control, and authority throughout the timeframe of the fraudulent scheme, including before the Decedent's death.

160. The Decedent and Hildenbrand combined their labor, efforts, property, and financial resources in furtherance of Potomac Solutions'

business activities. The Decedent provided technical services and generated revenue through federal subcontracting work, while Hildenbrand exercised control over partnership funds, received and spent partnership income, and utilized the partnership's profits for her own and the partnership's benefit.

161. Hildenbrand's independent control over and interest in the PS Entities is demonstrated in a number of ways, including, but not limited to, that, despite control over the Potomac Solutions LLC bank account in which funds owed to RCS were deposited, Hildenbrand refused to reimburse RCS upon demand, thereby confirming her ability to control, and actual control over, Potomac Solutions LLC's assets and business decisions.

162. At all times since January 31, 2023, Hildenbrand has continued to exercise control over the Potomac Solutions, LLC bank account and Potomac Solutions, LLC's assets, including real property in North Carolina; has made operational and strategic decisions on behalf of Potomac Solutions, LLC; has paid property taxes on Potomac Solutions, LLC's property in North Carolina; and, yet, has failed to pay out funds to RCS despite a valid demand for same. Meanwhile,

Hildenbrand has not sought appointment of a receiver or other third-party to liquidate Potomac Solutions, LLC's assets for the payment of creditors. To this day, Hildenbrand continues to control Potomac Solutions, LLC's assets and bank accounts.

163. Both the Decedent and Hildenbrand further contributed to the fraud scheme. Despite utilizing a bank account in the name of Potomac Solutions, LLC and maintaining unfettered control over Potomac Solutions, LLC's assets, neither Decedent, nor Hildenbrand, registered Potomac Solutions, LLC as a formal entity, contributing to the concealment of the true nature of the Decedent's and the PS Entities' fraud.

164. As partners in a partnership performing on federal government contracts, both the Decedent and Hildenbrand had an affirmative and mandatory duty to make a report to the Government if they came across credible evidence of a violation of the federal False Claims Act or other procurement violation. Both the Decedent and Hildenbrand had credible evidence of a violation of the federal False Claims Act and other procurement violations given their access to funds derived from the fraudulent scheme that were substantially

disproportionate to the amount of time the Decedent was working, yet neither the Decedent nor Hildenbrand made the mandatory report.

165. At all times relevant hereto, Hildenbrand was a general partner in the unincorporated PS Entities. She had unilateral control over and unrestricted access to the PS Entities' assets, including each and every payment made by RCS to the Decedent and the PS Entities by virtue of her access to and control over the Potomac Solutions LLC bank account, where the payments were deposited. She had no obligation to seek the Decedent's consent or to otherwise observe corporate formalities to access those funds or to spend them in her absolute discretion. She also exercised control over Potomac Solutions, LLC's business operations after the Decedent's death, making strategic and operational decisions, including not to pay Potomac Solutions, LLC's creditors.

166. Hildenbrand also benefitted greatly from the receipt of the fraudulently-obtained funds by spending those funds for personal items and to transfer cash to her personal bank accounts without the need to obtain the Decedent's consent or observe corporate formalities.

167. By virtue of her partnership in the PS Entities, Hildenbrand is liable, personally and individually, to the same extent the PS Entities

are liable for the amount of the indemnification owed to RCS.

168. In addition, Hildenbrand is personally liable for the fraud committed against RCS by the PS Entities, and the associated indemnification obligations arising therefrom, through veil piercing, because the PS Entities did not observe any corporate formalities and the PS Entities were used to perpetuate a fraud and to avoid the Decedent and Hildenbrand incurring personal liability for the Decedent's and the PS Entities' fraud and other wrongdoing.

**COUNT IV**
**Constructive Trust**
**(All Defendants)**

169. Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth and restated herein.

170. By virtue of the close personal relationship between the Decedent and PS Entities (on one hand) and RCS (on the other hand) and the trust RCS placed in the Decedent and the PS Entities, the Decedent and the PS Entities were in confidential and fiduciary relationships with RCS with respect to their work on the Prime Contract.

171. The Decedent and the PS Entities breached a duty of candor

and good faith to RCS when they misrepresented and over-reported the hours they worked on the ECS Prime Contract.

172. That breach of the duty of candor and good faith led to RCS paying the Decedent and the PS Entities in an amount in excess of $913,145.00, for work not performed.

173. RCS had a beneficial interest in the funds paid to the Decedent and the PS Entities because, if incorrect, those funds would be due by RCS to ECS Federal.

174. RCS suffered a loss in an amount in excess of $913,145.00, solely and exclusively as a result of the Decedent's and the PS Entities' false representations of the hours they claim to have worked on the ECS Prime Contract and the Decedent's, the PS Entities', and Hildenbrand's active concealment of the fraud by failing to register Potomac Solutions, LLC as a valid business, failing to report fraudulent conduct, despite a mandatory duty to do so, and utilizing Potomac Solutions, LLC's assets for personal use without observing corporate formalities.

175. RCS has actually paid ECS $913,145.00, and the Decedent, Hildenbrand, and the PS Entities have failed and otherwise refused to reimburse RCS for those losses with the first portion of the payment

credited in January 2023 and the remainder credited in March and April 2023.

176. It would be unjust and unsatisfactory as a matter of law and policy for RCS to suffer losses caused solely and exclusively by the Decedent, Hildenbrand, and the PS Entities. Indeed, Hildenbrand and the PS Entities—particularly Hildenbrand—have been unjustly enriched by the Decedent's and the PS Entities' wrongdoing and fraud, receiving almost $1 million in funds for work not performed, spending lavishly for personal use and refusing to pay legitimate claims of creditors despite funds in Potomac Solutions, LLC's bank account available for same and by refusing to appoint a receiver to liquidate Potomac Solutions, LLC's assets following the Decedent's death.

177. RCS has no adequate remedy at law from the Decedent or PS Entities, as Hildenbrand did not open an estate for the Decedent, and the PS Entities have a small amount of assets remaining following Hildenbrand's constant unilateral spending of the PS Entities' income between 2017 and the present for personal use.

178. The Decedent and the PS Entities must compensate RCS for all losses incurred as a result of the Decedent's and the PS Entities'

misconduct, including in an amount in excess of $913,145.00 which RCS paid to ECS as a result of the Decedent's and the PS Entities' overbilling on the ECS Prime Contract.

179. At all times relevant hereto, the Decedent and Hildenbrand voluntarily associated to carry on the business known as Potomac Solutions as co-owners for profit, thereby forming a general partnership under N.C.G.S. § 59-36(a). As noted above, both the Decedent and Hildenbrand exercised absolute joint dominion and control over Potomac Solutions, LLC's assets, including all funds obtained as a result of the fraudulent scheme. They had authority to use Potomac Solutions, LLC's assets without seeking approval from each other or other partners and without exercising any corporate formalities whatsoever. And they exercised this unilateral dominion, control, and authority throughout the timeframe of the fraudulent scheme, including before the Decedent's death.

180. The Decedent and Hildenbrand combined their labor, efforts, property, and financial resources in furtherance of Potomac Solutions' business activities. The Decedent provided technical services and generated revenue through federal subcontracting work, while

Hildenbrand exercised control over partnership funds, received and spent partnership income, and utilized the partnership's profits for her own and the partnership's benefit.

181. Hildenbrand's independent control over and interest in the PS Entities is demonstrated in a number of ways, including, but not limited to, that, despite control over the Potomac Solutions LLC bank account in which funds owed to RCS were deposited, Hildenbrand refused to reimburse RCS upon demand, thereby confirming her ability to control, and actual control over, Potomac Solutions LLC's assets and business decisions.

182. At all times since January 31, 2023, Hildenbrand has continued to exercise control over the Potomac Solutions, LLC bank account and Potomac Solutions, LLC's assets, including real property in North Carolina; has made operational and strategic decisions on behalf of Potomac Solutions, LLC; has paid property taxes on Potomac Solutions, LLC's property in North Carolina; and, yet, has failed to pay out funds to RCS despite a valid demand for same. Meanwhile, Hildenbrand has not sought appointment of a receiver or other third-party to liquidate Potomac Solutions, LLC's assets for the payment of

creditors. To this day, Hildenbrand continues to control Potomac Solutions, LLC's assets and bank accounts.

183. Both the Decedent and Hildenbrand further contributed to the fraud scheme. Despite utilizing a bank account in the name of Potomac Solutions, LLC and maintaining unfettered control over Potomac Solutions, LLC's assets, neither Decedent, nor Hildenbrand, registered Potomac Solutions, LLC as a formal entity, contributing to the concealment of the true nature of the Decedent's and the PS Entities' fraud.

184. As partners in a partnership performing on federal government contracts, both the Decedent and Hildenbrand had an affirmative and mandatory duty to make a report to the Government if they came across credible evidence of a violation of the federal False Claims Act or other procurement violation. Both the Decedent and Hildenbrand had credible evidence of a violation of the federal False Claims Act and other procurement violations given their access to funds derived from the fraudulent scheme that were substantially disproportionate to the amount of time the Decedent was working, yet neither the Decedent nor Hildenbrand made the mandatory report.

185. At all times relevant hereto, Hildenbrand was a general partner in the unincorporated PS Entities. She had unilateral control over and unrestricted access to the PS Entities' assets, including each and every payment made by RCS to the Decedent and the PS Entities by virtue of her access to and control over the Potomac Solutions LLC bank account, where the payments were deposited. She had no obligation to seek the Decedent's consent or to otherwise observe corporate formalities to access those funds or to spend them in her absolute discretion. She also exercised control over Potomac Solutions, LLC's business operations after the Decedent's death, making strategic and operational decisions, including not to pay Potomac Solutions, LLC's creditors.

186. Hildenbrand also benefitted greatly from the receipt of the fraudulently-obtained funds by spending those funds for personal items and to transfer cash to her personal bank account without the need to obtain the Decedent's consent or observe corporate formalities. Because those funds ultimately should have remained in RCS's possession, if not for the Decedent's and PS Entities' fraud, RCS has a beneficial interest in all assets purchased or maintained with those funds, including any and all personal and/or real property owned by Hildenbrand and/or the

PS Entities, regardless of how such property is titled.

187. By virtue of her partnership in the PS Entities, Hildenbrand is liable, personally and individually, to the same extent the PS Entities are liable for the amount of their fraud.

188. In addition, Hildenbrand is personally liable for the fraud committed against RCS by the PS Entities, and is responsible for paying RCS through a constructive trust, through veil piercing, because the PS Entities did not observe any corporate formalities and the PS Entities were used to perpetuate a fraud and to avoid the Decedent and Hildenbrand incurring personal liability for the Decedent's and the PS Entities' fraud and other wrongdoing.

189. It would be inequitable and unjust for Hildenbrand and the PS Entities to retain the fruits of the Decedent's and the PS Entities' fraud, while RCS, which bears absolutely no responsibility for the Decedent's and the PS Entities' wrongdoing, bears the full responsibility and the destruction of Reiter's life's work.

## COUNT V
## Unfair Commercial Practices
## (All Defendants)

190. Plaintiff incorporates by reference the allegations contained

in the previous paragraphs of this Complaint as if fully set forth and restated herein.

191. Over the course of the Decedent's and the PS Entities' subcontracting arrangement with RCS, and specifically from 2016 through 2020, the Decedent and the PS Entities made false representations of material fact to RCS when they submitted timesheets and invoices and reported hours worked to RCS that the Decedent and the PS Entities did not actually work.

192. These false statements were made by the Decedent on behalf of himself and the PS Entities on or about the 15th day of each month and the last day of each month, from January 1, 2016 through December 31, 2020.

193. The false statements included that the Decedent and the PS Entities had worked 40 hours per week on the ECS Federal Prime Contract when they did not work those hours, or anything close to them.

194. These false statements were made by the Decedent to ECS Federal (the timesheets) and by the Decedent to Reiter and RCS (the invoices) each time.

195. The false statements related to a material fact because ECS

Federal's Prime Contract, RCS' subcontract, and the Decedent's and the PS Entities' second-tier subcontracting arrangement were all time and materials-type contracts, meaning that the parties were only paid for the hours worked and materials provided.

196. The amount of time actually worked was material because it formed the basis for all payments to the Decedent and the PS Entities and any misrepresentation of those hours worked would result in a fraud against the government.

197. The Decedent knew, and by virtue of the Decedent's knowledge, the PS Entities knew, at the time they reported their hours to RCS, that the reports were false. The Decedent himself was performing the work, thus he was the person in the best position to know the accurate number of hours he actually worked. But the Decedent was working far less than the 40 hours per week on the ECS Prime Contract that he reported.

198. Furthermore, Hildenbrand knew that the Decedent was not working an average of 17 hours per day, every day, or near the number of hours he billed. Hildenbrand also knew that the Decedent was not working sufficient hours to generate the kind of income he was

generating, including receiving funds that allowed the Decedent and Hildenbrand to purchase multiple properties and pay for Hildenbrand's lavish high-spending lifestyle.

199. The Decedent, on behalf of himself and the PS Entities, intended to deceive RCS by misrepresenting the hours actually worked in order to obtain additional money to which they were not entitled.

200. RCS acted in reliance on the Decedent's misrepresentations, made on behalf of the Decedent himself and the PS Entities, by actually paying the Decedent and the PS Entities for the misrepresented hours.

201. Prior to January 11, 2023, RCS could not have discovered the Decedent's and PS Entities' fraud through the exercise of due diligence because it had no access to Perspecta's or the third contractor's records, the Government's investigatory file, or the Potomac Solutions, LLC bank account records, all of which are confidential business records to which RCS had no right or authority to access. Nor could RCS interview or investigate the matter itself, because the Decedent had died on October 4, 2021 and was unavailable for interview or investigation by RCS.

202. Further, RCS did not have knowledge of the fraudulent use of unregistered limited liability companies or corporations or Hildenbrand's

unfettered access to the corporate bank accounts.

203. As a direct and proximate result of the Decedent's and the PS Entities' fraud, RCS suffered damages in the amount of at least $913,145.00, plus attorneys' fees and costs associated with remedying the fraud.

204. The Decedent's and the PS Entities' fraud was committed with actual malice and intent to harm and was based on an intentional misrepresentation, justifying an award of exemplary and/or punitive damages. Specifically, the Decedent, on behalf of himself, Hildenbrand, and the PS Entities, engaged in the scheme with the specific purpose of benefiting both him and Hildenbrand and with intentional disregard for RCS' rights.

205. RCS did not suffer damages as a result of the Decedent's and PS Entities' fraud until at least January 2, 2023, when it gave ECS Federal a credit against its unpaid invoices.

206. At all times relevant hereto, the Decedent and Hildenbrand voluntarily associated to carry on the business known as Potomac Solutions as co-owners for profit, thereby forming a general partnership under N.C.G.S. § 59-36(a). As noted above, both the Decedent and

Hildenbrand exercised absolute joint dominion and control over Potomac Solutions, LLC's assets, including all funds obtained as a result of the fraudulent scheme. They had authority to use Potomac Solutions, LLC's assets without seeking approval from each other or other partners and without exercising any corporate formalities whatsoever. And they exercised this unilateral dominion, control, and authority throughout the timeframe of the fraudulent scheme, including before the Decedent's death.

207. The Decedent and Hildenbrand combined their labor, efforts, property, and financial resources in furtherance of Potomac Solutions' business activities. The Decedent provided technical services and generated revenue through federal subcontracting work, while Hildenbrand exercised control over partnership funds, received and spent partnership income, and utilized the partnership's profits for her own and the partnership's benefit.

208. Hildenbrand's independent control over and interest in the PS Entities is demonstrated in a number of ways, including, but not limited to, that, despite control over the Potomac Solutions LLC bank account in which funds owed to RCS were deposited, Hildenbrand refused to

reimburse RCS upon demand, thereby confirming her ability to control, and actual control over, Potomac Solutions LLC's assets and business decisions.

209. At all times since January 31, 2023, Hildenbrand has continued to exercise control over the Potomac Solutions, LLC bank account and Potomac Solutions, LLC's assets, including real property in North Carolina; has made operational and strategic decisions on behalf of Potomac Solutions, LLC; has paid property taxes on Potomac Solutions, LLC's property in North Carolina; and, yet, has failed to pay out funds to RCS despite a valid demand for same. Meanwhile, Hildenbrand has not sought appointment of a receiver or other third-party to liquidate Potomac Solutions, LLC's assets for the payment of creditors. To this day, Hildenbrand continues to control Potomac Solutions, LLC's assets and bank accounts.

210. Both the Decedent and Hildenbrand further contributed to the fraud scheme. Despite utilizing a bank account in the name of Potomac Solutions, LLC and maintaining unfettered control over Potomac Solutions, LLC's assets, neither Decedent, nor Hildenbrand, registered Potomac Solutions, LLC as a formal entity, contributing to the

concealment of the true nature of the Decedent's and the PS Entities' fraud.

211. On February 14, 2023, Hildenbrand then caused her attorney to send a letter to RCS that made representations as to the existence of the Decedent's estate when no such estate had been opened, and Hildenbrand had no intention to open such an estate.

212. As partners in a partnership performing on federal government contracts, both the Decedent and Hildenbrand had an affirmative and mandatory duty to make a report to the Government if they came across credible evidence of a violation of the federal False Claims Act or other procurement violation. Both the Decedent and Hildenbrand had credible evidence of a violation of the federal False Claims Act and other procurement violations given their access to funds derived from the fraudulent scheme that were substantially disproportionate to the amount of time the Decedent was working, yet neither the Decedent nor Hildenbrand made the mandatory report.

213. At all times relevant hereto, Hildenbrand was a general partner in the unincorporated PS Entities. She had unilateral control over and unrestricted access to the PS Entities' assets, including each

and every payment made by RCS to the Decedent and the PS Entities by virtue of her access to and control over the Potomac Solutions LLC bank account, where the payments were deposited. She had no obligation to seek the Decedent's consent or to otherwise observe corporate formalities to access those funds or to spend them in her absolute discretion. She also exercised control over Potomac Solutions, LLC's business operations after the Decedent's death, making strategic and operational decisions, including not to pay Potomac Solutions, LLC's creditors.

214. Hildenbrand also benefitted greatly from the receipt of the fraudulently-obtained funds by spending those funds for personal items and to transfer cash to her personal bank accounts and pay her bills both before and after the Decedent's death without the need to obtain the Decedent's consent or observe corporate formalities.

215. By virtue of her partnership in the PS Entities, Hildenbrand is liable, personally and individually, to the same extent the PS Entities are liable for the fraud and unfair commercial practices committed against RCS.

216. In addition, Hildenbrand is personally liable for the fraud and unfair commercial practices committed against RCS by the PS Entities

through veil piercing, because the PS Entities did not observe any corporate formalities and the PS Entities were used to perpetuate a fraud and to avoid the Decedent and Hildenbrand incurring personal liability for the Decedent's and the PS Entities' fraud and other wrongdoing

217. Hildenbrand independently engaged in wrongdoing beginning on or around January 31, 2023.

218. On that date, RCS issued a demand letter to Hildenbrand seeking payment from the Decedent's estate related to the fraudulent scheme RCS suffered at the Decedent's, Hildenbrand's, and the PS Entities' hands.

219. By that time, Hildenbrand had assumed total control over all of Potomac Solutions, LLC's assets, including its bank account and real property.

220. Yet, when a legitimate creditor approached her with a legitimate claim for reimbursement, Hildenbrand refused to pay that claim and did not seek to appoint a receiver for Potomac Solutions, LLC. Instead, she continued to exercise complete control over Potomac Solutions, LLC's assets to her personal benefit and to the detriment of creditors.

221. On February 14, 2023, Hildenbrand caused her attorney to send a letter to RCS that made representations as to the existence of the Decedent's estate when no such estate had been opened, and Hildenbrand had no intention of opening such an estate.

222. This was a material misrepresentation because it caused RCS to litigate against a non-existent estate instead of forcing the opening of an estate under North Carolina law.

223. Meanwhile, Hildenbrand has never disputed that the Decedent or the PS Entities engaged in fraud. Nor has Hildenbrand denied that RCS has a legitimate, valid, and payable claim against the Decedent or the PS Entities. Yet, she continues to refuse to pay that claim from Potomac Solutions, LLC's assets.

224. If Hildenbrand believed that Potomac Solutions, LLC was solely owned by the Decedent, it was her obligation to open, and she would have opened, an estate to dispose of the Decedent's ownership interests in Potomac Solutions, LLC and distribute its assets to creditors and/or the estate, as appropriate.

225. Hildenbrand did not open the estate or dispose of Potomac Solutions, LLC's assets, and instead utilized those assets for her own

personal use and benefit, indicating she understood she had an ownership interest in those assets as a partner in Potomac Solutions LLC.

226. Defendants' acts and omissions as described herein, including, but not limited to, the Decedent's, Hildenbrand's, and the PS Entities' fraudulent scheme, and Hildenbrand's efforts to usurp Potomac Solutions, LLC's assets for her own benefit and to the detriment of creditors with legitimate claims, were in or affecting commerce.

227. Defendants' acts and omissions as described herein, including, but not limited to, the Decedent's, Hildenbrand's, and the PS Entities' fraudulent scheme, and Hildenbrand's efforts to usurp Potomac Solutions, LLC's assets for her own benefit and to the detriment of creditors with legitimate claims, were unfair, deceptive, unscrupulous, oppressive, immoral, and substantially injurious to Plaintiff.

228. As a direct and proximate result of Defendants' conduct, Plaintiff have been damaged and will be damaged in an amount in excess of $913,145.00.

229. Accordingly, in addition to other allegations set forth in this Complaint, Defendants have engaged in unfair and deceptive commercial

practices pursuant to N.C.G.S. § 75-1.1.

230. Plaintiff is entitled to have its damages trebled pursuant to N.C.G.S. § 75-16.

231. Plaintiff is entitled to recover its attorneys' fees pursuant to N.C.G.S. § 75-16.1

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally, and award the following relief:

a. That the Court award compensatory damages in an amount in excess of $913,145.00;

b. That the Court award treble damages;

c. That the Court award punitive damages in an amount to be determined at trial and in compliance with due process and the United States Constitution but not less than $913,145.00;

d. That the Court enter an Order establishing a constructive trust as to any and all property obtained by Hildenbrand and/or the PS Entities as a result of the Decedent's and the PS Entities' fraud, in an amount to be established at trial, but

specifically including all real and personal property obtained between January 1, 2017 and the present with funds deposited or otherwise flowing through the Potomac Solutions LLC bank account;

e. That the Court award pre- and post-judgment interest;

f. That the Court award reasonable attorney's fees, costs, and other expenses incurred in this matter; and

g. That the Court award any and all other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 9, 2026

Respectfully submitted,

*/s/ Matthew E. Feinberg, Esq.*
Matthew E. Feinberg, Esq.
**PILIEROMAZZA PLLC**
1001 G Street, N.W., Ste. 1100
Washington, D.C. 20001
Ph: (202) 857-1000
Fx: (202) 857-0200
*mfeinberg@pilieromazza.com*

*/s/ Edward L. Bleynat, Jr.*
Edward L. Bleynat, Jr. (NC Bar No. 16558)
**FERIKES BLEYNAT & CANNON PLLC**
67 Charlotte Street
Asheville, NC 2880
Ph: (828) 251-1588
Fx: (828) 251-2214
*ed@ashevillelitigators.com*

*Attorneys for Plaintiff*